**UNITED STATES of America, Appellee,**

v.

**Richard ANDERSON, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Kenneth V. GREENWOOD, Appellant.**

Nos. 88–3096, 88–3134.

United States Court of Appeals, District of Columbia Circuit.

Argued May 16, 1989.

Decided Aug. 11, 1989.

M. Elizabeth Kent, Washington, D.C., (appointed by the court) for appellant Anderson in No. 88–3096.

David Kagan–Kans (appointed by the court) for appellant Greenwood in No. 88–3134.

Kathleen A. Felton, Attorney, U.S. Dept. of Justice, with whom Jay B. Stephens, U.S. Atty. and Michael K. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee in No. 88–3096 and No. 88–3134.

Before MIKVA and WILLIAMS, Circuit Judges, and HUBERT L. WILL,* Senior District Judge, United States District Court for the Northern District of Illinois.

Opinion for the Court filed by Circuit Judge MIKVA.

Concurring opinion filed by Senior District Judge WILL.

MIKVA, Circuit Judge:

These cases require us to decide whether the district court's denial of cross-examination of a prosecution witness regarding an unrelated murder indictment against her, dismissed without prejudice eleven months before trial, violated appellants' confrontation rights under the Sixth Amendment. We hold that the district court's ruling in this case was constitutional error, for the jury might reasonably have found that the government's ability to reinstate the mur-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

der charge furnished the witness with a motive for favoring the prosecution in her testimony. *See Delaware v. Van Arsdall,* 475 U.S. 673, 678–80, 106 S.Ct. 1431, 1434–36, 89 L.Ed.2d 674 (1986).

Because the witness in this case was a key witness against appellant Anderson and because the prosecution's case against Anderson was otherwise weak, we cannot conclude that the district court's denial of cross-examination was, on the record as a whole, harmless beyond a reasonable doubt as to Anderson. Accordingly, we must reverse Anderson's conviction and remand for a new trial. With respect to appellant Greenwood, however, the weight of the other evidence against him convinces us, beyond a reasonable doubt, that the denial of cross-examination was harmless as to him. Because we also reject Greenwood's other arguments on appeal, his convictions are affirmed.

## I.

Richard Anderson and Kenneth V. Greenwood were convicted on May 16, 1988, after an eight-day jury trial, of various narcotics and firearms charges. Greenwood was found guilty of unlawful use of a firearm in aid of drug trafficking, in violation of 18 U.S.C. § 924(c)(1); unlawful possession with intent to distribute five grams or more of a mixture containing cocaine base, in violation of 21 U.S.C. § 841(a); and possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d). Anderson was convicted of unlawful possession with intent to distribute five grams or more of a mixture containing cocaine base, in violation of 21 U.S.C. § 841(a). Both appeal.

### A. *Facts*

On the evening of November 19, 1987, D.C. Metropolitan Police officers, pursuant to a search warrant, forcibly entered Apartment 201 at 3507 Jay Street, N.E., Washington, D.C. The police found several people inside the two-story apartment. On the second floor, a woman, Kim J. Vanfield, was stopped as she was entering the bathroom and trying to close the door behind her. In an adjacent bedroom, a woman in a nightgown, later identified as Pearl L. Patterson, was lying on a bed, a man was standing in the room, and another man, appellant Greenwood, was hiding in the closet. Police found a loaded .32 caliber revolver under the mattress of the bed on which Patterson was lying. Police searched Greenwood and found two small packets of marijuana and $75 in cash. Police also seized a plastic bag containing "crack" cocaine from Patterson's purse and a plastic container of a rock-like substance from Vanfield's person.

Police found appellant Anderson standing in the doorway of the other bedroom. According to the arresting officer, Investigator DePasse, Anderson threw approximately $500 in cash behind the partially-opened bedroom door when the police approached. Other police officers, however, did not see Anderson throw down any money, or at least could not recall. DePasse testified that Officer Howard, the main "seizing officer," must have initially picked up the money, but Howard testified that he neither saw nor seized any money from the bedroom floor. Officer Proulx, the crime scene search officer, stated that he neither saw nor photographed money on the bedroom floor. No drugs, money, or firearms were recovered from Anderson, who did not attempt to resist arrest or flee.

Police recovered from the bedroom behind Anderson 20 grams of "crack" cocaine, about four ounces of cocaine powder, a triple-beam scale, a glass plate with traces of white powder, and a torch head for use with a butane canister. The bedroom also contained a loaded .32 caliber revolver in a holster attached by a clip to the bedframe; an unregistered sawed-off shotgun, broken down into its parts, with ammunition, inside a brown bag on the floor; and another bag on the floor containing ammunition for both guns, almost $200 cash, and a small amount of marijuana. Police also seized, from the lock on the inside of the bedroom door, a set of keys in a black key case and, from the bedroom itself, a photograph of appellant Greenwood, a calculator, a small green notebook,.

a wallet containing appellant Greenwood's driver's license and some photos, and a tax return and other documents bearing Vanfield's name.

Police arrested Anderson, Greenwood, Vanfield, and Patterson; four persons downstairs were searched, interviewed, and released. No narcotics were found or seized from the kitchen, kitchen table, dining room, or dining room table. Vanfield and Patterson later pled guilty to simple possession of a controlled substance, in violation of 18 U.S.C. § 844.

### B. *Prosecution Testimony*

Detective Lorren Leadmon, one of the officers who participated in the execution of the search warrant, testified that he had seen Greenwood and Vanfield in the Jay Street apartment two days earlier and that Greenwood gave him a tour of the apartment. Leadmon stated that Greenwood used a set of keys in a black key case to unlock the door of the bedroom in which the drugs, guns, and drug paraphernalia were later found. Leadmon identified the keys and key case seized from the bedroom during the November 19 search as those that he saw Greenwood use on November 17. Leadmon also asserted that on two subsequent occasions, in December 1987 and January 1988, he returned to the same apartment and Greenwood answered the door both times. Leadmon testified that Greenwood stated that he and Vanfield, his girlfriend, were living in the apartment.

John Kraemer, a documents examiner with the Metropolitan Police Department and a qualified handwriting expert, testified for the prosecution that, in his opinion, Vanfield was the writer of several of the entries in the notebook that had been seized from the bedroom and that Greenwood was probably the writer of several of the other entries, but that he could not associate Anderson with any of the writings in the notebook.

Detective Charles DiDomenico testified as an expert in the sale and distribution of illegal drugs in Washington, D.C. He explained the difference between cocaine in powder form and cocaine base, or "crack,"

and how the powder is used to produce crack cocaine. He testified that the quantity of drugs, the weapons, the paraphernalia, the notations in the notebook, and the cash found in the apartment were inconsistent with personal use, but were typical of items found in a "crack house," a place where crack cocaine is processed, sold, and prepared for distribution.

### C. *Tanya Barnes' Testimony*

Tanya Barnes, one of the persons present in the apartment during the November 19 raid, testified for the prosecution over defense counsel's objection that Barnes' name was not given in the government's pretrial notice of witnesses. Barnes, testifying under a grant of complete transactional and use immunity, stated that, on the day of the raid, she saw Anderson and Greenwood carrying bags of some kind into the apartment and that she saw Greenwood carry a package of cocaine upstairs. She recalled that, later that day, she saw Greenwood, and then Anderson, in the kitchen processing (or "cooking") the cocaine powder into crack, although she admitted to falling asleep when Anderson was cooking the cocaine. She also testified that, when the police arrived that evening, there was crack in the kitchen and crack, plastic bags, and an upside-down jar containing crack on the dining room table, all of which she stated the police seized.

Barnes further testified that she had seen Anderson and Greenwood together in the apartment on two prior occasions that fall: on the first occasion she saw Greenwood, but not Anderson, selling drugs, and on the second occasion she saw Greenwood selling cocaine and Anderson "holding" a large quantity of crack.

The jury did not hear, however, that Barnes had been charged with second-degree murder in June 1986 and that the charge was dismissed without prejudice in April 1987, less than a year before appellants' trial. This charge was first revealed to the court by defense counsel at voir dire on the morning of the second day of Barnes' testimony:

MR. STOWE [counsel for Anderson]: My other request, Your Honor, is this, *to be allowed to question the witness concerning the dismissal of the murder charges,* because it is our understanding from interviewing a number of witnesses or a number of persons last night out in the Mayfair–Paradise area that this was brought about or came about *as a result of an agreement between the witness and Detective Leadmon that in return she would work for Detective Leadmon and give him certain information.*

Now, whether these persons are telling the truth I do not know, and that's the reason why I've asked the Court for permission to ask the question first or have the Court voir dire the witness about it.

THE COURT: What is this about, murder?

MR. STOWE: Yes, sir.

THE COURT: Whose murder?

MR. STOWE: She had a murder case, a murder in the second degree case, which evidently evolved from a stabbing of another female as I understand it, and as a result of that stabbing, she was charged. And then *the case was dismissed.*

Now, we do not know whether the case—unless Mr. Dubester has knowledge of it, *we do not know whether the case was dismissed because it lacked merit or whether it was because of an agreement* that exists between Detective Leadmon and this witness and the Government, and if that's the case, then I think we should be able to delve into it, if she's a paid informant for the police department and things of that nature, because *I think it goes to credibility and bias.*

Tr. 659–60 (emphasis added). The prosecutor conceded that Barnes had been charged with murder on June 26, 1986, but claimed that the case had been dismissed less than a week later. The court permitted defense counsel to question Barnes regarding the murder charge during voir dire, Tr. 661, and Anderson's attorney cross-examined Barnes as follows:

Q. Are you a paid informant by Detective Leadmon?

A. No, I'm not.

Q. Is a contract out for your life?

A. By who?

Q. By *the people that you turned in to Mr. Leadmon on three occasions to get your murder case dropped?*

A. No.

Q. Are you sure?

A. Positive.

Tr. 679 (emphasis added).

After the completion of voir dire, the district court, in response to the prosecutor's objection to reference to the murder charge before the jury, ruled that defense counsel would have to make a proffer before cross-examining Barnes on the murder charge. Greenwood's attorney argued that the dismissed charge was relevant to impeach Barnes and that, in any event, Barnes had been granted transactional immunity and thus could not be prosecuted for the murder. The prosecutor responded by revising the grant of immunity to "[t]ransactional immunity for November 19 and use immunity for everything else." The court, focusing on the question of impeachment, indicated that Barnes could be impeached by evidence of prior criminal acts. Anderson's attorney then explained that:

MR. STOWE: I was advised by my investigator who said he talked to a number of people last night in the Mayfair–Paradise area and explained to him that they was there—that the charges had been dropped. The murder charges had been dropped, and in return for her cooperation with Detective Leadmon as an informant, and that a contract for her life was put out by people out there, because *she had provided Detective Leadmon with information that lead [sic] to the arrest and bust of three narcotic houses.*

Tr. 684 (emphasis added). Barnes' attorney requested a few minutes to consult with Barnes regarding the murder charge and with the prosecutor regarding the grant of immunity.

In the meantime, the court pressed Anderson's attorney for a proffer that Barnes' murder charge was dismissed in return for her work as an informant:

THE COURT: Look, the point is that you've already had the opportunity to explore [whether Barnes' case was dismissed in return for her work], and she has denied it. *You have no basis for going beyond that at this time.* If you are going to go beyond that at this time, then you've got to give me your proffer.

Tr. 687 (emphasis added). Anderson's attorney proffered that he would subpoena witnesses who would say that Barnes was an informant. The prosecutor objected that such evidence would be based on hearsay and responded that Officer Leadmon had denied that Barnes was a paid informant.

Before the court had an opportunity to rule on defense counsel's proffer, Barnes' attorney informed the court that she and the prosecutor had agreed that Barnes was to have transactional and use immunity for all events on or before November 19. Barnes' attorney also explained that:

MS. LOBO [counsel for Barnes]: * * *

As far as this homicide or murder investigation, I have a completely different understanding of what that involved. My understanding is that my client was assaulted by a gay woman and another person and a woman was stabbed. The woman also was apparently fighting with somebody else after fighting with my client, and that there were several—*the reason that the prosecution was dismissed was because there were a number of witnesses who flipped their stories over.* Apparently a defense attorney in that case from the Public Defenders Service was able to get a number of statements from witnesses who later changed statements and there was apparently a problem with some investigator.

THE COURT: So there's been no deal made?

MS. LOBO: *There was no deal made* in that she had no contact with Leadmon or never worked for Leadmon as a result of that.

Tr. 691–92 (emphasis added). Anderson's attorney accepted the representation, but added that he would check into his "witnesses who say differently, and whether these are witnesses now that will flip-flop back that flipped the first time, I don't know." After some hesitation, the district court ruled out questioning regarding the dismissed murder charge:

THE COURT: * * * What are the questions that you intend to ask?

* * * * * *

MR. STOWE [counsel for Anderson]: *I was going to go in and ask her about that whether she has given information to Detective Leadmon as the result of an agreement to—that's caused three places to be raided for drugs, and one's in the same area as—*

THE COURT: *I'll permit that question.* Now, what is the next question?

MR. DUBESTER [prosecutor]: You will permit that?

THE COURT: What's wrong with that question?

MR. DUBESTER: How does that establish motive? That somebody is a good citizen in the community.

THE COURT: No, no, no, *because he's going to raise the question whether she's a paid informant;* isn't that it?

MR. STOWE: That's right.

THE COURT: *I think it is permissible to ask that question.*

Go ahead. Now, what is the next question?

MR. STOWE: That's the only questions I had to ask her about that.

THE COURT: Well, what about the murder?

MR. STOWE: The murder, *I'm going to ask her whether she was charged with murder in the second degree and whether there was an agreement with her and Detective Leadmon.*

THE COURT: Well, if you ask that, I'm going to permit Mr. Dubester to bring out these other facts.

MR. DUBESTER: Your Honor, we cannot retry a murder case here.

THE COURT: I understand that, but I think you are going to open yourself up on that one, because if you are going to get into that—

MR. DUBESTER: Your Honor, *that is so remote.*

THE COURT: *We don't have any basis that goes beyond what Ms. Lobo said here today; is that correct?*

MR. DUBESTER: That's correct.

THE COURT: And you know nothing different from than that? *I'm going to rule it out, because there is no basis other than the fact of a fact that there was a charge and it was dismissed, and there is nothing that is beyond that.* It has nothing to do—Mr. Leadmon had nothing to do with that; is that correct, Ms. Lobo?

MS. LOBO [counsel for Barnes]: That's what I understand, Your Honor.

THE COURT: All right. *So I'm going to rule it out.* You can have your exception.

MR. GARBER· [counsel for Greenwood]: In that connection, I know you have ruled on that. We just found out about this witness yesterday. We are still in the process of investigating.

THE COURT: Look, I'm going to give you full ability to bring whom you want to bring. You can bring back every one of the Government's witnesses, and I'll permit you to cross-examine those witnesses.

MR. GARBER. All right. Thank you.

Tr. at 693–95 (emphasis added).

Upon completion of direct examination, Anderson's attorney requested permission to ask about the murder charge, noting that the charge had been dismissed without prejudice and arguing that Barnes had been granted transactional immunity and thus could not be reindicted as a result of her testimony. The district court agreed:

MR. STOWE: * * * I'm saying that because [the prosecutor] has given transactional immunity to all of this, I think the jury should know this, and know that she can't be—know that anything she says can't be used to rebring the following cases which have been dismissed, one, the murder case. And I think that that should be permitted to be told to the jury.

THE COURT: *I'll allow it.*

Tr. 707. The prosecutor immediately informed the court, however, that he did not have the authority to grant transactional immunity, at least with regard to the murder charge. Despite protests from defense counsel that the prosecutor was reneging on his grant of complete transactional immunity, the court sustained Barnes' attorney's objection to cross-examination regarding the murder charge.

Later that day, Anderson's attorney informed the court that, according to the pretrial services report from D.C. Superior Court, the June 1986 murder charge was dismissed, not a week or a month later as the prosecutor had asserted, but in July 1987. Tr. 784. Barnes' attorney reiterated her objection to questions regarding the murder charge, based on potential Fifth Amendment problems: "I understand the Court ruled this morning that my objection to going into that would be sustained." When the prosecutor also objected to any reference to the murder charge, Anderson's attorney responded "I'm not going to ask that. *I've been told I can't ask that.*" (emphasis added). Anderson's attorney then referred to *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), in which the Supreme Court reversed a conviction where the defense attorney had not been permitted to show the witness' vulnerable status as a probationer and therefore possible bias. *See Davis,* 415 U.S. at 318, 94 S.Ct. at 1111; Tr. 786. The court responded that unless defense counsel could show that Detective Leadmon was involved in the dismissal of the murder charge, questions regarding the murder charge would not be allowed:

THE COURT: Well, again, you have nothing that indicates that * * * Leadmon had anything to do with the dismissal of that case?

MR. STOWE: *No, not the murder case.* No. *I'm not going to go into the murder case,* Your Honor. All I—

THE COURT: All right. Okay.

*Because if there is anything, I will permit you to get into that.*

Tr. 787 (emphasis added).

On cross-examination, Barnes admitted to prior drug use and prior drug convictions. Barnes also stated that she first found out about the trial two days before she was called to the stand, when Detective Leadmon and another officer served her with a subpoena. Barnes explained that she had known Leadmon since 1983 or 1984 and made a passing reference to meeting him in connection with her murder charge. Barnes further recalled that, before she was actually served with a subpoena, she overheard two police officers who were searching for her threaten that, if she did not show up, "they were going to issue a warrant that I would never forget and they would make sure I would be put away for a long period of time." Barnes later confirmed that it was Detective Leadmon who served her with the subpoena on March 7 at her house.

### D. *Defense Testimony*

Lieutenant Charles Miller, who had been present during execution of the search warrant, testified that Pam Green (Barnes' cousin) was not on the premises during the raid. Chancy Spruell, manager of the apartment complex at 3507 Jay Street, N.E., stated that a Cynthia Davis was listed as the tenant of the apartment, had been a tenant since June 1, 1982, but had stopped paying rent since at least March 1987. Patrick Hoye, a private investigator, testified that he had been unable to locate the address given by Tanya Barnes as the address of her cousin, Pam Green. Finally, another private investigator, Sherman Hogue, stated that he visited the apartment three times in the three months before trial; that he found a "crack house or a drug house" with considerable drug activity; and that although he saw from 10 to 15 people in the apartment each time, he never saw Anderson on the premises.

## II.

### A. *Denial of Cross–Examination*

■ Appellants argue that the district court violated their constitutional right to confront witnesses testifying against them by refusing to permit cross-examination of Tanya Barnes regarding her dismissed murder charge. We agree.

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." U.S. Const. amend. VI. It is well-settled that "[c]onfrontation means more than being allowed to confront the witness physically." *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). "Indeed, '[t]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.'* " *Delaware v. Van Arsdall,* 475 U.S. 673, 678, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) (quoting *Davis,* 415 U.S. at 315–16, 94 S.Ct. at 1110 (quoting 5 J. Wigmore, *Evidence* § 1395, at 123 (3d ed. 1940) (emphasis in original))).

In particular, cross-examination is permitted not only to impeach the general credibility of a witness, but also to expose "possible biases, prejudices, or ulterior motives of the witness as they may relate to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' " *Davis,* 415 U.S. at 316, 94 S.Ct. at 1110 (quoting 3A J. Wigmore, *Evidence* § 940, at 775 (Chadbourne rev. ed. 1970)); *see also United States v. Abel,* 469 U.S. 45, 52, 105 S.Ct. 465, 469, 83 L.Ed.2d 450 (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."); *Villaroman v. United States,* 184 F.2d 261, 262 (D.C.Cir.1950) ("Bias of a witness is always relevant."). In sum, "the exposure of a witness' motivation in testifying is a proper and important function of

the constitutionally protected right of cross-examination." *Davis*, 415 U.S. at 316–17, 94 S.Ct. at 1110 (citing *Greene v. McElroy*, 360 U.S. 474, 496, 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959)).

In *Davis*, the Court ruled that a criminal defendant must be allowed to impeach the credibility of a prosecution witness by cross-examination directed at possible bias deriving from the witness' probationary status as a juvenile delinquent, even though such cross-examination would conflict with the state's asserted interest in preserving the confidentiality of juvenile adjudications of delinquency. *See Davis*, 415 U.S. at 320, 94 S.Ct. at 1112; *see also Alford v. United States*, 282 U.S. 687, 693, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931). The Court concluded that, although it could not speculate whether the jury would have accepted defense counsel's argument that the prosecution witness was possibly biased, "the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the witness'] testimony which provided 'a crucial link in the proof ... of petitioner's act.'" *Davis*, 415 U.S. at 317, 94 S.Ct. at 1111 (quoting *Douglas v. Alabama*, 380 U.S. 415, 419, 85 S.Ct. 1074, 1077, 13 L.Ed.2d 934 (1965)). Indeed, the Court reasoned that, to make cross-examination effective, "defense counsel should have been permitted to expose to the jury the facts from which jurors, as sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Id.* 415 U.S. at 318, 94 S.Ct. at 1111.

Similarly, in *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the Court held that a defendant was denied his constitutional right to effective cross-examination where "the trial court prohibited *all* inquiry into the possibility that [the witness] would be biased as a result of the State's dismissal of his pending public drunkenness charge." *Id.* at 679, 106 S.Ct. at 1435. The Court, relying on *Davis*, reasoned that "[b]y thus cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found fur-

nished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated respondent's rights secured by the Confrontation Clause." *Id.* (footnote omitted). In so ruling the Court stated that:

> We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited in engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness."

*Id.* at 680, 106 S.Ct. at 1436 (quoting *Davis*, 415 U.S. at 318, 94 S.Ct. at 1111).

We hold that appellants in this case have satisfied this test. Public records from the D.C. Superior Court, Criminal Division, reveal that on June 26, 1986, Tanya D. Barnes was charged with second degree murder while armed, in violation of 22 D.C. Code §§ 2403, 3202. *See* Complaint, *United States v. Barnes*, Crim. No. F–5110–86 (D.C.Super.Ct. filed June 26, 1986). At a preliminary hearing on July 3, the case was held pending grand jury action. On December 9, 1986, Barnes was indicted by a grand jury for the same offense. *See* Indictment, *United States v. Barnes*, Crim. No. F–5110–86 (D.C.Super.Ct. filed Dec. 9, 1986). At her arraignment on December 23, 1986, Barnes pled not guilty and requested a jury trial. After two unsuccessful attempts in January, a status hearing was held on February 6, 1987, at which trial was scheduled for March 2, 1987. On February 18, Judge Wertheim, granting Barnes' motion for continuance, converted the trial date to a status hearing to hear Barnes' suppression motion and set a new trial date of April 27, 1987. On March 2, however, the court was unable to reach the motion to suppress, although it noted that the government had eight witnesses, and rescheduled the hearing on the suppression motion for April 1 and trial for May 11, 1987. On April 1, 1987, the murder count was dismissed by the government. *See*

Jacket Cover, *United States v. Barnes*, Crim. No. F–5110–86 (D.C.Super.Ct.1987).

■ Thus, contrary to the prosecutor's assertion at trial that the charge was dismissed less than a week later, Tr. 661, Barnes' murder charge was in fact dismissed without prejudice more than nine months after she was initially charged and only eleven months before appellants' trial. Although the district court ruled that the dismissed charge could be raised only if defense counsel could show an agreement between Barnes and the prosecution, we find that even if no agreement existed, a murder indictment against a witness, recently dismissed without prejudice, reveals "a prototypical form of bias on the part of the witness," *Van Arsdall*, 475 U.S. at 680, 106 S.Ct. at 1436, and is "relevant as discrediting the witness and affecting the weight of [her] testimony," *Davis*, 415 U.S. at 316, 94 S.Ct. at 1110. Where the district court is aware of a recently dismissed indictment, as the court below was, cross-examination must be permitted to raise the possibility that the prosecution's ability to reinstate the indictment gave the witness a motive for favoring the prosecution. *See United States v. Masino*, 275 F.2d 129, 132 (2d Cir.1960) (trial court erred in denying defendant the opportunity to cross-examine a principal prosecution witness concerning the recent dismissal of a narcotics charge against him); *cf. United States v. Maynard*, 476 F.2d 1170, 1174 (D.C.Cir.1973) (Bazelon, C.J.) ("the pendency of an indictment against a witness produces a discernable motivation to falsify testimony such as * * * interest in currying a favorable disposition from the prosecution").

Moreover, this circuit has ruled that "[t]he permissible scope of exploration on cross-examination is not curtailed by the absence of promises for leniency, for the defense may attempt to show government 'conduct which might have led a witness to believe that his prospects for lenient treatment by the government depended on the degree of his cooperation.'" *United States v. Leonard*, 494 F.2d 955, 963 (D.C. Cir.1974) (quoting *United States v. Campbell*, 426 F.2d 547, 549 (2d Cir.1970)). In

the case *sub judice*, the prosecutor conceded that Barnes had been charged with murder and that the charge was dismissed without prejudice to reinstatement; Barnes may have feared that if she did not testify favorably for the prosecution, the murder charge might have been reinstated. Such subjective government influence, even if objectively unwarranted, is precisely the kind that *Leonard* held was ripe for cross-examination at trial. Cross-examination for possible bias arising from this fact would "expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Davis*, 415 U.S. at 318, 94 S.Ct. at 1111; *see also Van Arsdall*, 475 U.S. at 680, 106 S.Ct. at 1435. Because "[p]roof of bias is almost always relevant," *Abel*, 469 U.S. at 52, 105 S.Ct. at 469, we conclude that the jury in this case was "entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the witness'] testimony * * *." *Davis*, 415 U.S. at 317, 94 S.Ct. at 1111.

The government maintains on appeal that *Davis*, *Abel*, and *Van Arsdall* are inapposite because the underlying fact tending to show bias in those cases was not disputed. *See Davis*, 415 U.S. at 310–11, 94 S.Ct. at 1107 (undisputed that the witness was on probation as a juvenile delinquent); *Abel*, 469 U.S. at 47–49, 105 S.Ct. at 466–68 (undisputed that defense witness and defendant were fellow members of a secret prison gang); *Van Arsdall*, 475 U.S. at 676, 106 S.Ct. at 1433–34 (prosecution witness admitted that a criminal charge against him had been dropped in exchange for his agreement to speak with the prosecutor about the crime at issue). The government argues that in this case, by contrast, defense counsel never made an adequate showing of the underlying allegations that would be probative of bias.

We agree with the premise of this argument but not with its conclusion. The basic requirement of relevancy, as well as other factors affecting admissibility, must of course still be met with regard to evidence of bias. We do not denigrate the

trial courts' "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on * * * cross-examination [for potential bias] based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679, 106 S.Ct. at 1435.

■ But "[a] trial may limit cross-examination only after there has been permitted, *as a matter of right*, a certain threshold level of cross-examination which satisfies the constitutional requirement." *United States v. Christian*, 786 F.2d 203, 213 (6th Cir.1986) (emphasis added) (quoting *Niziolek v. Ashe*, 694 F.2d 282, 289 (1st Cir. 1982)). To require evidence of an actual cooperation agreement between Detective Leadmon and Barnes, as the district court in this case did, overlooks the inherent and independent relevance of the *mere fact* of a recently dismissed murder charge, a charge which hung over the witness' head like the sword of Damocles, particularly in this case where Barnes admitted that she met Leadmon in connection with her murder charge and that Leadmon was one of the officers who served her with the subpoena for her testimony. Evidence that a prosecution witness is subject to reindictment by the prosecution is, by itself, probative of potential bias and is therefore a proper subject of cross-examination under the Confrontation Clause. *Cf. Francis v. Dugger*, 697 F.Supp. 472, 475–76 (S.D.Fla.1988) (finding Confrontation Clause violation where trial judge prohibited cross-examination into prosecution witness' pending second-degree murder charge). Under these circumstances, defense counsel should have been permitted at least exploratory cross-examination to establish the relevance of the dismissed murder indictment and to impeach Barnes for possible bias arising therefrom. *See Alford*, 282 U.S. at 694, 51 S.Ct. at 220 (trial courts may not "cut off *in limine* all inquiry on a subject with respect to which the defense was entitled a reasonable cross-examination").

The government further notes that such cross-examination might have interjected evidence unrelated to any issue at trial, but "[b]ias is never classified as a collateral matter which lies beyond the scope of inquiry, nor as a matter on which an examiner is required to take a witness's answer. Bias may be proved by extrinsic evidence even after a witness's disavowal of partiality." *United States v. Robinson*, 530 F.2d 1076, 1079 (D.C.Cir.1976) (quoting 2 Weinstein's Evidence ¶ 607[03], at 607–17 (1975)). In any event, we are convinced that the district court could easily have confined cross-examination and any redict examination to the fact most relevant to potential bias—the murder indictment and its dismissal without prejudice.

B. *Harmless Error*

Our finding of constitutional error in this case does not, however, end the inquiry. "[T]he constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis." *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438. Thus, "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* Indeed, the *Van Arsdall* Court gave specific guidance in making such determinations:

> Whether such an error is harmless in a particular case depends on a most of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.* (citing *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969); *Schneble v. Florida*,

405 U.S. 427, 432, 92 S.Ct. 1056, 1059–60, 31 L.Ed.2d 340 (1972)).

### 1. *Appellant Anderson*

█ Assuming, as we must, that the "damaging potential of the cross-examination were fully realized," *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438, we cannot confidently say, on the record as a whole, that error in this case was harmless beyond a reasonable doubt as to Anderson.

Tanya Barnes, who testified for almost three full days in an eight-day trial, was a key witness against Anderson. Her highly damaging testimony regarding Anderson's "cooking" of crack on the day of the raid and the prior occasions on which she saw Anderson and Greenwood at the apartment was not cumulative of other evidence at trial. The only evidence corroborating her testimony was police testimony that she was present in the apartment during the raid, and indeed significant portions of her testimony were directly contradicted by those same officers. Had defense counsel been able to pursue his theory that Barnes may have been biased by the prospect of reinstatement of her murder indictment, the jury might reasonably have found that Barnes had a substantial motive to favor the prosecution in her testimony.

Moreover, the prosecution's case against Anderson was otherwise weak: Anderson was found standing in the doorway of the bedroom in which drugs were located, and one officer, but not others, testified that he saw Anderson throw some money to the floor behind the bedroom door. For all of the above reasons, we cannot conclude that the denial of cross-examination in this case was harmless beyond a reasonable doubt. *See Van Arsdall,* 475 U.S. at 681, 106 S.Ct. at 1436.

### 2. *Appellant Greenwood*

█ With respect to Greenwood, however, even if the jury had discounted Barnes' testimony as biased, the other evidence against him convinces us beyond a reasonable doubt that the denial of cross-examination in this case was harmless as to him.

The prosecution had ample evidence connecting Greenwood to the drugs and weapons seized in the bedroom, including his possession two days earlier of the key to the bedroom, the presence of his personal articles (e.g., his wallet under a pillow on the bed and the key in the door) in the room, his admission that he was living in the apartment with his girlfriend, and his presence in the adjacent bedroom at the time the police arrived with the search warrant. Barnes' testimony that Greenwood "cooked" crack on the day of the raid and was seen distributing drugs on prior occasions, although damaging, was thus not central to the prosecution's case against Greenwood. Reviewing the evidence in the record as a whole, we must conclude that the district court's denial of cross-examination of Barnes for possible bias was harmless beyond a reasonable doubt as to Greenwood.

### C. *Greenwood's Other Arguments*

Because we hold that Greenwood's Sixth Amendment claim fails to warrant reversal of his convictions, we review briefly his other arguments.

### 1. *Jury Instruction Regarding "Carrying" a Firearm*

█ Greenwood first claims that the trial judge gave an erroneous jury instruction on the meaning of using or "carrying" a firearm during and in relation to a drug trafficking offense:

> The term used means to employ or avail oneself of. The term carry means to bear on or about one's person *or to be convenient of access* or *within reach.*

Tr. 1247–48 (emphasis added). Greenwood argues that the instruction, which defines "carrying" to include "convenient of access" or "within reach," impermissibly broadens the meaning of the term "carrying," where, as in this case, Greenwood was found in one bedroom and the guns in another. Because defense counsel did not object to the instruction Greenwood concedes on appeal that the plain error standard applies. *See* Fed.R.Crim.P. 52(b).

We find this argument almost frivolous. The phrase "uses or carries" in 18 U.S.C. § 924(c)(1) has not been limited to actual discharge of a firearm or possession of a firearm on one's person. *See United States v. Robinson*, 857 F.2d 1006, 1010 (5th Cir.1988) (affirming conviction where guns were found in defendant's residence); *United States v. Matra*, 841 F.2d 837, 841–43 (8th Cir.1988). More importantly, the deviation of the instruction given from the standard "Redbook" instruction (with which Greenwood presumably agrees) is so trivial that no reasonable jury would likely even have noted the difference, much less relied on it to the prejudice of Greenwood. *Cf.* District of Columbia Bar Association, Criminal Jury Instructions, No. 4.81 (3d ed. 1978) (a weapon is carried " ' * * * on or about the defendant's person' if it is located in such proximity to the person as to be convenient of access and within reach"). We are therefore confident that the disputed instruction was not plainly erroneous.

### 2. Sufficiency of Evidence for Carrying of Firearms Conviction

■ Greenwood also contends that, even viewing the evidence in the light most favorable to the government, *see United States v. James*, 764 F.2d 885, 889 (D.C.Cir. 1985), no reasonable juror could have concluded beyond a reasonable doubt that Greenwood used or carried a firearm during and in relation to a drug trafficking offense. Greenwood asserts, in essence, that there was nothing to connect him with the guns found in the bedroom with the drugs.

We disagree. First, as noted above, there was substantial evidence connecting Greenwood to the bedroom in which the guns were found. Second, there was ample evidence from which the jury could reasonably infer that the guns were an integral part of the drug trafficking operation—the proximity of the guns to the drugs and drug paraphernalia, the presence of loaded guns and ammunition, and expert testimony that guns are often found in "crack houses" to protect drug traffickers and their investment. *See Robinson*, 857 F.2d at 1010 (finding sufficient evidence to support a charge of use of a firearm during a drug trafficking crime where police found drugs, including cocaine packaged for further distribution, and seven firearms, two of them loaded, in defendant's house). In light of these two factors, we conclude that the jury's verdict was based on sufficient evidence of guilt and that the district court properly denied the motion for acquittal on this count.

### 3. Sufficiency of Evidence for Firearms Possession Conviction

■ Greenwood next maintains that there was insufficient evidence to establish beyond a reasonable doubt that he possessed the unregistered shotgun found in the bedroom with the drugs.

Possession may be actual or constructive; constructive possession is inferred from knowing dominion and control over the item in question. *See United States v. Hernandez*, 780 F.2d 113, 116 (D.C.Cir. 1986). Greenwood argues that the facts in this case do not permit an inference of knowing dominion and control, because, even assuming that Greenwood resided in the apartment with Vanfield, there was no evidence that Greenwood knew of the shotgun's presence.

As discussed above, there is plainly sufficient evidence to conclude that Greenwood was living in the apartment and used the bedroom in which the shotgun was later found. The shotgun was found in a bag on the floor in the middle of the room to which Greenwood had a key. The jury could reasonably have inferred that Greenwood knew of the gun's presence in the bedroom and had dominion and control over it. Greenwood offered no evidence that someone else might have planted the shotgun in the bedroom. Viewing the evidence from the point of view most favorable to the government, we accordingly conclude that there was sufficient evidence for a rational jury to find that Greenwood had constructive possession of the shotgun.

### 4. Drug Test of Tanya Barnes

■ Greenwood next argues that the district court abused its discretion in denying

his request for a drug test of Tanya Barnes. *See United States v. Butler*, 481 F.2d 531, 533 (D.C.Cir.1973) (trial court did not abuse its discretion in declining to order examination of prosecution witness who admitted to having used narcotics).

Greenwood concedes that there is a presumption against ordering such an examination, because it " 'may seriously impinge on a witness' right to privacy; * * * the examination itself could serve as a tool of harassment;' and the likelihood of an examination could deter witnesses from coming forward," *Butler*, 481 F.2d at 534 (quoting *United States v. Benn*, 476 F.2d 1127, 1131 (D.C.Cir.1972)), but argues in this case that a simple drug test would not have seriously invaded Barnes' privacy rights, that Barnes was in any event testifying under immunity and that Barnes' testimony was uncorroborated by extrinsic evidence.

Although Greenwood's strongest argument relates to the unreliability of Barnes' testimony, a point that distinguishes this case from *Butler*, *see* 481 F.2d at 535 (refusal to order examination was not an abuse of discretion where court found "substantial corroborative evidence introduced by the government"), we hold that this factor, standing alone, is insufficient to disturb the district court's exercise of discretion in this case. The court denied defense counsel's request after observing Barnes' demeanor and questioning her as to her past and current drug use. The court allowed probing cross-examination before the jury as to Barnes' prior involvement with and use of drugs and instructed the jury regarding the credibility of witnesses. Moreover, Greenwood's argument that Barnes' testimony was inconsistent with other evidence at trial hurts more than it helps him, because the jury, having heard the testimony firsthand, could well have discounted Barnes' entire testimony as incredible.

Thus, given the myriad credibility determinations involved, determinations that are not for us to second guess, we conclude that the district court in this case did not abuse its discretion in not ordering Barnes to undergo a drug test.

### 5. *Admission of Prior Bad Acts Evidence*

■ Greenwood argues finally that the district court abused its discretion under Federal Rule of Evidence 404(b) in admitting evidence of Greenwood's prior bad acts, namely, Barnes' testimony that she observed Greenwood transacting drugs in the apartment on two prior occasions. Greenwood's primary contention is that this evidence was not closely related in time to the offense charged, because Barnes testified only that the prior occasions were sometime in the fall (September or October), where as Greenwood was arrested on November 19. Moreover, Greenwood argues that Barnes' testimony should have been excluded under Rule 403 because its vagueness rendered it highly prejudicial.

■ These contentions are insufficient to upset the trial court's ruling in this case. *See United States v. Moore*, 732 F.2d 983, 989 (D.C.Cir.1984) (admitting similarly vague testimony regarding prior acts occurring a few weeks before defendants' arrests). The district court's balancing of probative value and prejudicial impact will be overturned only for abuse of discretion. *See United States v. Payne*, 805 F.2d 1062, 1066 (D.C.Cir.1986). Given the preference for admission in close cases, *see id.*, and the fact that the court gave limiting instructions, we hold that the district court's admission of Barnes' testimony that she observed Greenwood transacting drugs in the apartment on two prior occasions was not an abuse of discretion.

### III.

The district court in this case erred in not permitting defense counsel to cross-examine a key government witness for bias arising from a recently dismissed murder indictment. Even if defense counsel could not prove an express agreement to cooperate, we hold that the mere fact that the charge was dismissed without prejudice to

reinstatement is relevant to bias and is thus a proper subject of cross-examination.

We reverse appellant Anderson's conviction because we cannot say that such constitutional error was harmless beyond a reasonable doubt as to him. We affirm appellant Greenwood's convictions, however, because the weight of the other evidence against him convinces us that the error was harmless beyond a reasonable doubt as to him.

*It is so ordered.*

WILL, Senior District Judge, concurring.

I agree that Anderson's conviction must be reversed because defense counsel should have been permitted under the facts and circumstances here to cross-examine Barnes without having to make a preliminary showing of bias or duress. I write separately only because I believe that the trial judge has a responsibility once apprised of such facts and circumstances to be satisfied that the full extent of any possible bias or duress has been explored before exercising discretion as to the scope of any cross-examination. A preliminary voir dire by defense counsel of not only the witness but others having knowledge of the events, with judicial participation if necessary, to bring out all the facts is an essential predicate to the determination of the appropriate scope of cross-examination before the jury.