47 F.3d 1168
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Martin L. EVANS, Sr., Petitioner-Appellee,
v.
Anthony BRIGANO, Warden, Respondent-Appellant.
 No. 94-3384.
 United States Court of Appeals, Sixth Circuit.
 Jan. 12, 1995.
 
 On Appeal from the United States District Court, for the Northern District of Ohio, No. 93-07454; Don J. Young, Judge.
 REVERSED.
 Before: MARTIN and BOGGS, Circuit Judges; and BELL, District Judge.[1]
 PER CURIAM.
 
 
 1
 This is an appeal from a district court's granting of the petitioner's writ of habeas corpus. The respondent contends that the district court erred when it concluded that the state trial court had violated the petitioner's right of confrontation and that the error was not harmless. We find the respondent's contentions persuasive, and REVERSE the district court's judgment.
 
 
 2
 * On September 1, 1990, three individuals--the petitioner, Martin L. Evans, Sr.; Gary Roth; and Evans's brother-in-law, Roger Warner--went fishing on Lake Erie on an eighteen-foot boat. During the course of the day, Warner got into an argument with Roth and Evans, which prompted Evans to decide that they should head back to shore. On their way back to shore, Warner squeezed the priming bulb, which caused the boat to stall several times. Evans proceeded to go to the rear of the boat where he and Warner began to fight. At this point the accounts of Evans and Roth diverge with regard to the events of the fight.
 
 
 3
 At trial, Evans testified that, prior to their fight, Warner had made several threats, including allusions to strangling Evans with a sock. According to Evans, Warner twisted and snapped a sock while Evans was attempting to restart the engine. Evans also testified that Warner threw a punch at him and that he responded by throwing a ceramic mug at Warner. According to Evans, the mug missed Warner and shattered at the rear of the boat. Evans related how a fight ensued in which Warner had the upper hand and was trying to force him overboard. Evans testified that he grabbed a piece of the broken mug and swung it over his shoulder several times until Warner suddenly went limp and fell overboard.
 
 
 4
 Roth testified that he had not heard Warner make several of the threats that Evans claimed he had made. He also testified that he never saw a sock until Evans pointed it out while they were cleaning the boat at Roth's apartment. Roth further stated that, while he did not see the first punches, when he first saw the fight, Evans was on top of Warner, punching down at him and yelling at him. He testified that he saw Evans push Warner overboard just moments after breaking the mug.
 
 
 5
 The witnesses' accounts again converge at this point. Both testified that they pulled Warner back into the boat and rushed back to shore. However, Warner died before they reached shore.
 
 
 6
 Following questioning by the police, Evans and Roth were permitted to take the boat back to Roth's apartment, where they proceeded to clean up the blood and pieces of ceramic in the boat.
 
 
 7
 In September 1990, Evans was indicted on one count of murder and one count of tampering with evidence, and Roth was indicted for tampering with evidence. Prior to trial, the prosecutor dismissed without prejudice the tampering charges against both men. At the state-court trial on the murder charge, the prosecutor called Roth as a witness to testify against Evans. Evans intended to cross-examine Roth with regard to potential bias resulting from this dismissal. However, the prosecutor made a motion in limine to prohibit the petitioner from cross-examining Roth in this regard. Pursuant to this motion, the court held an in camera hearing. In response to questions from both the court and Evans's defense attorney, Roth testified that the prosecutor had dismissed the evidence-tampering charge against him for lack of evidence. He further testified that there was no agreement between the prosecutor and himself that the charge would be dismissed if he testified against Evans, and that no such agreement was ever sought by either one. Following this in camera hearing, the court granted the motion. The court concluded that there was no evidence of a promise of favorable treatment in exchange for Roth's testimony and that the cross-examination would therefore lack relevancy. At the conclusion of the trial, the jury found Evans guilty of murder. The court sentenced him to imprisonment for a period of not less than fifteen years nor more than life.
 
 
 8
 On December 4, 1990, Evans filed a motion for new trial. He attached to this motion the affidavit of Richard Roberts, the Lucas County Coroner Investigator. In the affidavit, Roberts stated that he had spoken to Roth's counsel, who told him that the prosecutor had dismissed the tampering charge against Roth "in return for his testimony against" Evans. He further stated that an Assistant Lucas County Prosecutor had told him the same thing.
 
 
 9
 The court held a hearing with regard to Evans's motion. At the hearing, Roberts recanted these statements from his affidavit, which had been prepared by Evans's counsel. He testified that he had heard only that the prosecutor would drop the charge against Roth if Roth passed a polygraph test, and that he assumed that Roth had made a deal with the prosecution. Roth's defense attorney, Jill Kelly, also testified at the hearing. She stated that there was no bargain with regard to the dismissal of the charge against Roth and that the dismissal resulted from the prosecutor's deciding that there was a lack of evidence. The prosecuting attorney, Lawrence Kiroff, also testified that he did not dismiss the charge against Roth in exchange for his testimony at Evans's trial, and that he dismissed the tampering charge against both Roth and Evans because he "didn't have sufficient evidence to proceed." On the basis of the testimony of these and other witnesses at the hearing, the court denied Evans's motion for a new trial on January 30, 1991.
 
 
 10
 Evans appealed to the Ohio Court of Appeals. His first assignment of error was that the trial court had violated his Sixth Amendment right of confrontation when it prohibited him from cross-examining Roth on the issue of bias. On February 14, 1992, the court of appeals affirmed the judgment against him. The court of appeals concluded that the dismissed indictment was irrelevant since there was no evidence of a bargain between the prosecutor and Roth, and was therefore properly excluded.
 
 
 11
 On March 13, 1992, Evans filed his notice of appeal to the Ohio Supreme Court. Again, Evans presented the Confrontation Clause issue. On July 15, 1992, the Ohio Supreme Court denied leave to appeal. Evans's petition for Writ of Certiorari in the United States Supreme Court was similarly denied on January 11, 1993.
 
 
 12
 On July 17, 1993, Evans filed his petition for writ of habeas corpus in the district court asserting that the state trial court had violated his right of confrontation. On January 26, 1994, the district court granted his petition, concluding that the trial court had violated his constitutional right of confrontation and that this error was not harmless beyond a reasonable doubt. On February 7, 1994, the respondent moved the district court to alter its judgment with regard to its harmless error analysis in light of Brecht v. Abrahamson, 113 S. Ct. 1710 (1993), which held that the harmless-error standard for habeas corpus review of a trial-type error is whether the error "'had substantial and injurious effect or influence in determining the jury's verdict."' Id. at 1722 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). On March 10, 1994, the court denied the respondent's motion to alter the judgment, holding that "the trial court's failure to allow cross examination on the issue of bias had a substantial and injurious influence in determining the jury's verdict."
 
 
 13
 The respondent's timely appeal followed.
 
 II
 
 14
 The respondent contends that the district court erred in concluding that the state trial court violated his right of confrontation by not allowing him to cross-examine Roth for possible bias relating to the dismissal of the tampering charge, and also erred in finding that the error was not harmless. This court reviews de novo the district court's granting of Evans's writ of habeas corpus. See Wright v. Dallman, 999 F.2d 174, 178 (6th Cir. 1993).
 
 
 15
 * The Sixth Amendment's Confrontation Clause guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." This guarantee applies to state prosecutions as well as federal. Pointer v. Texas, 380 U.S. 400 (1965) (holding that the guarantees of the Confrontation Clause are incorporated into the Due Process Clause of the Fourteenth Amendment). "'The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination."' Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986) (quoting Davis v. Alaska, 415 U.S. 308, 315-16 (1974)). Cross-examination allows a defendant to impeach the general credibility of a witness as well as expose "possible biases, prejudices, or ulterior motives of the witness as they may relate to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony."' Davis, 415 U.S. at 316.
 
 
 16
 In Van Arsdall, the Supreme Court found a violation of a defendant's right of confrontation where "the trial court prohibited all inquiry into the possibility that [the witness] would be biased as a result of the State's dismissal of his pending public drunkenness charge." Van Arsdall, 475 U.S. at 679. The Court summarized its holding by stating:
 
 
 17
 We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness."
 
 
 18
 Id. at 680 (quoting Davis, 415 U.S. at 318). Of course, not all limitations on the cross-examination of a prosecution witness run afoul of the right of confrontation:
 
 
 19
 [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on [cross-examination inquiring into the potential bias of a prosecution witness] based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.
 
 
 20
 Id. at 679.
 
 
 21
 In Van Arsdall, the link establishing potential bias was much stronger than in the instant case. In that case, the witness readily admitted that a criminal charge had been dismissed in exchange for his testimony. Id. at 676. As has been indicated above, there is no evidence of such an agreement in the instant case. Evans correctly contends, however, that evidence of such an agreement is not absolutely necessary for a limitation of cross-examination to constitute constitutional error. See, e.g., United States v. Anderson, 881 F.2d 1128 (D.C. Cir. 1989).
 
 
 22
 Evans asserts that Anderson supports his position that, even where no agreement exists, an indictment against a prosecution witness, dismissed without prejudice, is a form of bias about which the court must permit cross-examination. We do not read Anderson so broadly. In Anderson, the District of Columbia Circuit Court of Appeals found that the witness, Tanya Barnes, had been charged and indicted for second-degree murder and that the case was not dismissed for nearly nine months, during which time she had successfully moved for a trial continuance and had moved to suppress evidence. The government also had eight witnesses it planned to call at her trial. Id. at 1137. It appears that the reason for the dismissal was that several witnesses had apparently changed their statements regarding the event. Id. at 1134. The court concluded that, "[u]nder these circumstances, defense counsel should have been permitted at least exploratory cross-examination to establish the relevance of the dismissed murder indictment and to impeach Barnes for possible bias arising therefrom." Id. at 1139.
 
 
 23
 Unlike Anderson, the charge against Roth that the prosecutor had dismissed was a comparatively minor charge of tampering with evidence. More significantly, the fact-specific inquiry in Anderson indicated that the government had a number of witnesses set to be called and had been set to go to trial, at least prior to a continuance, while this prosecutor dismissed the evidence-tampering case against both Evans and Roth for lack of evidence. Thus, whereas the facts of Anderson are "facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness," see Van Arsdall, 475 U.S. at 680 (quoting Davis, 415 U.S. at 318), such an inference could not appropriately be drawn under the facts of the instant case. Evans's cross-examination of Roth in this regard would not, therefore, have been even marginally probative of bias. Accordingly, we conclude that Evans's right of confrontation was not violated in his state-court trial.
 
 B
 
 24
 Even were we to assume arguendo that the state trial court had erred by prohibiting Evans's cross-examination of Roth for bias related to the dismissal of the tampering charge against him, we would nevertheless conclude that such error was harmless. The violation of a defendant's right of confrontation is subject to harmless error analysis. Id. at 684. In a habeas corpus case, where a petitioner challenges his conviction collaterally, an error is harmless unless it "had a substantial and injurious effect on the jury's verdict." Brecht v. Abrahamson, 113 S. Ct. 1710, 1722 (1993). Thus, when a court considers a Confrontation Clause violation in a habeas corpus proceeding, the relevant harmless-error inquiry is "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error," Van Arsdall, 475 U.S. at 684, "had a substantial and injurious effect on the jury's verdict," Brecht, 113 S. Ct. at 1722.
 
 
 25
 Applying this standard to the facts of the instant case, it is clear that this error did not have a substantial or injurious effect on the verdict. Had Evans cross-examined Roth regarding the dismissal, the prosecutor would have rehabilitated Roth's credibility by presenting the witnesses it called at the hearing on Evans's motion for new trial and Roth himself. As he did at the trial court's in camera hearing, Roth would have testified that the prosecutor had dismissed the evidence-tampering charge against him for lack of evidence and that there was no agreement between the prosecutor and himself that the charge would be dismissed if he testified against Evans and that no such agreement was ever sought by either one. All other witnesses would have fully agreed. In light of the uncontradicted and overwhelming evidence that the prosecutor had dismissed the tampering charge against Roth for lack of evidence to prosecute him, the damage to his credibility would have been slight, if existent at all. Such slight damage would not have had a substantial and injurious effect on the jury's verdict and, accordingly, the error was harmless.
 
 III
 
 26
 For the reasons stated above, we REVERSE the district court's judgment.
 
 
 
 [1]
 The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation