**UNITED STATES of America**

v.

**Tyrone DERR, Appellant.**

No. 91–3309.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 4, 1993.

Decided April 20, 1993.

Joseph R. Conte, Washington, DC (appointed by this Court), for appellant.

Steven J. Durham, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, John R. Fisher, Elizabeth Trosman, and Per A. Ramfjord, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before MIKVA, Chief Judge, WALD and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Tyrone Derr was convicted of possessing cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii), and of using a firearm in relation to that possession, in violation of 18 U.S.C. § 924(c)(1). On appeal, Derr claims: (1) the district court improperly limited his cross-examination of a government witness; (2) the government breached its duty to provide him with material, exculpatory evidence before trial; and (3) the government produced insufficient evidence at trial to support the jury's verdict that he "used" a firearm in relation to his possession of cocaine. We agree that no reasonable juror could have concluded that Derr "used" a firearm to facilitate his drug possession, but reject Derr's other contentions; accordingly, we reverse his firearms conviction and affirm his drug possession conviction.

## I. BACKGROUND

On January 14, 1991, relying on an informant's tip that James Lanham possessed a .9 millimeter pistol and a .30 caliber rifle at 911 Varney Street, S.E., apartment 22, the Metropolitan Police Department obtained a warrant to search that residence. At that time, James Lanham lived in apartment 22 with his brother Michael Lanham, his cousin Chay Rawls, and their grandmother Hilda Meredith. Appellant Derr, a friend of Michael Lanham, sometimes stayed there as well, mostly on weekends. The police arrived to execute the warrant at about 9:45 a.m. on January 23, 1991; the officers found Derr, clad in boxer shorts, sleeping in one of the bedrooms. Chay Rawls and an unknown woman were sleeping in another bedroom, and James Lanham was dozing in a third.

After waking all the occupants and securing them in the living room,[1] the officers began their search of the apartment. In the bedroom where Derr had been sleeping, Detective James Trainum found a pager and a set of keys on a small wooden table. When Trainum overheard Sergeant James Vucci complaining about a padlock he could not open on a closet door, Trainum brought the keys from the Derr bedroom to try on the padlock; one of them worked the lock. Sergeant Vucci then searched the closet. Atop a pile of miscellaneous items—a rolled-up rug, stereo equipment, personal papers—Vucci came upon an unloaded, holstered .357 Magnum revolver and a plastic bag containing nine rounds of .357 ammunition. Directly under the gun and bullets was another plastic bag containing both Derr's birth certificate and a padlocked wooden box. Using the same set of keys, the officers unlocked the box and found inside 18.4 grams of crack cocaine as well as paraphernalia for drug distribution—many small ziplock bags, a wad of about $1100 in cash, a glass plate, and a small portable scale. A carrying case and a cleaning kit for a .9 millimeter gun were also discovered on a nearby closet shelf.

The closet was not, however, the sole source of drug trafficking evidence in the apartment. The officers' search of James Lanham's room turned up a rock of cocaine, as well as a triple-beam scale, two rounds of live .357 Magnum ammunition, and a pager. (James Lanham was charged with possession of that cocaine and pled guilty in the Superior Court of the District of Columbia.) Additionally, in the apartment's common areas the officers discovered several pouches of fake cocaine—commonly known as "burn bags"—as well as a crack pipe, a plastic razor blade case, and numerous syringes.

At the conclusion of their search, the officers arrested Derr. Having been told to get dressed to go to the police station, Derr returned to the bedroom where he was originally found, grabbed some clothes out of a trunk and the bedroom closet, and put them on. Then, according to Detective Trainum, Derr "reached over to the table as if he was going for the keys" (which had been returned to their original location),

---

1. When the officers arrived to search the premises, they also found an ill man in the fourth bedroom, an unidentified man and woman asleep on a living room sofa, and another police officer and a nurse standing in the living room.

but abruptly "stopped, pulled his hand back, and began to walk out of the room."

Derr was later charged with possession of more than five grams of cocaine with intent to distribute and using a firearm during and in relation to his possession of the drugs. At trial, the government sought to establish Derr's possession of the contraband through the police officers' testimony that his birth certificate was found in the same bag as the drugs and directly beneath the gun, that the keys to the hall closet and the wooden box were discovered in the room where Derr was sleeping, and that he made a motion to grab those keys as he was leaving the apartment. Hilda Meredith, the lessee of the apartment and the grandmother of the Lanham brothers and Chay Rawls, also testified for the prosecution. She claimed that, in 1990, Derr "took possession" of the hall closet by putting a new padlock on the door. Finally, to show that Derr "used" the .357 Magnum in relation to possession of the drugs, the government offered expert testimony from Officer David Stroud that that weapon is the revolver of choice among drug traffickers and that such a gun is often employed to guard a trafficker's "turf," keep his employees in line, and protect him from hold-up men.

At the close of the prosecution's case, Derr moved, unsuccessfully, for acquittal. He then mounted a defense designed to show that he was simply in the "wrong place at the wrong time" and that the drugs in question belonged to the Lanham brothers. To that end, Derr highlighted the fact that cocaine and drug paraphernalia were found in James Lanham's room and in common areas of the apartment. Derr himself testified that he did not live in the apartment, that he had no key to it, and that on the day he was arrested, he had arrived at the apartment only hours before

the police and was in Michael Lanham's room, waiting for him to return home. Finally, Derr explained away the damning fact that his birth certificate was found in the plastic bag with the drugs by saying that he had lost the document a month earlier at a party at the apartment and had not seen it since.

At the close of his own case, Derr again moved unsuccessfully for acquittal. The jury subsequently convicted him on both counts.

## II. DISCUSSION

### A. Limitations on Cross–Examination

On April 4, 1991, several months after Derr's arrest in January and shortly before his trial, a second search under warrant of apartment 22 turned up 25 grams of cocaine, drug paraphernalia, and large amounts of cash. As a result of that search, all three of Hilda Meredith's grandchildren—Chay Rawls, James Lanham, and Michael Lanham—were arrested and charged with conspiracy to possess cocaine as well as possession of cocaine with intent to distribute. In cross-examining Meredith at Derr's trial, his attorney sought to question her about those later arrests to establish a motive on her part for testifying that Derr alone had access to the hall closet at the time of the first arrest. More specifically, Derr's counsel sought to suggest by the later drug arrests that the narcotics found in the closet earlier may have belonged to the grandsons, not Derr, and thus that Meredith had a strong incentive to direct suspicion away from her own family members and onto Derr.[2] The district court, however, cut off this line of questioning, reasoning that the lapse of time between Derr's January arrest and the grandchildren's April arrests vitiated any relevance of the latter to the grandchil-

---

**2.** On appeal, Derr argues that the later arrests raise questions as to Meredith's own possible "knowledge of and benefit from" the drug transactions in her home. *See* Appellant's Brief at 26–27. But that argument was not raised below; accordingly, we can review the trial court's failure to accept it only for plain error, *i.e.,* whether its mistake was both very obvious and gravely prejudicial. *See, e.g., United States v.*

*Foster,* 988 F.2d 206, 209 (D.C.Cir.1993); *see also United States v. Bounds,* 985 F.2d 188, 193 (5th Cir.1993) (applying plain error standard to allegation of Confrontation Clause violation not asserted at trial). Since we cannot say that this new theory of possible bias was obvious, we do not find that the trial court committed plain error in not accepting it.

dren's culpability for the drugs found months before. Derr now claims that this decision impinged upon his Confrontation Clause rights under the Sixth Amendment.

 We do not think so. As the Supreme Court has explained, the Confrontation Clause does not bar a judge from imposing reasonable limits on a defense counsel's inquiries: "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). Accordingly, Confrontation Clause violations are found primarily where defendants have been given *no* realistic opportunity to ferret out a potential source of bias. *See, e.g., id.* (violation found where "trial court prohibited *all* inquiry into the possibility that [the prosecution witness] might be biased" because of the state's dismissal of his pending public drunkenness charge) (emphasis in original); *United States v. Pryce*, 938 F.2d 1343, 1345 (D.C.Cir.1991) (violation found where court "barred defense counsel from asking *any* questions about [witness'] hallucinations") (emphasis in original), *cert. denied*, —— U.S. ——, 112 S.Ct. 1488, 117 L.Ed.2d 629 (1992) (appellant Donovan), *cert. denied*, —— U.S. ——, 112 S.Ct. 1679, 118 L.Ed.2d 396 (1992) (appellant Thomas). Conversely, courts usually deny such claims so long as defense counsel is able to elicit enough information to allow a "discriminat[ing] appraisal of the witness's motives and bias." *United States v. Robinson*, 832 F.2d 366, 373 (7th Cir.1987) (internal quotation omitted), *cert. denied*, 486 U.S. 1010, 108 S.Ct. 1739, 100 L.Ed.2d 203 (1988); *see also United States v. Boylan*, 898 F.2d 230, 254 (1st Cir.) ("So long as a

reasonably complete picture of the witness' veracity, bias, and motivation is developed, the judge enjoys power and discretion to set appropriate boundaries. Indeed, the judge has a responsibility to do so.") (internal citation omitted), *cert. denied*, 498 U.S. 849, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990).

 This case falls into the second category. The trial court allowed Derr ample opportunity to question Meredith about any bias stemming from her desire to shield her grandchildren from suspicion. Importantly, Derr's counsel was able to elicit testimony about the fact of James Lanham's arrest for drug possession on the same day as Derr [3] and about the fact that Michael Lanham normally slept in the bedroom where the keys to the closet and locked box were found. Additionally, he was of course able to point to the physical evidence from the January search—the narcotics and drug paraphernalia found in James Lanham's room and the apartment's common areas. All of this had significant potential for showing that Meredith's testimony could have been colored by the desire to protect her own grandchildren from implication in possession of the drugs found in the closet.[4] For that reason, we conclude that the trial court's decision to disallow any questioning about the April arrests, a matter which could reasonably be viewed as only marginally relevant and which might indeed have confused the jury about which issues were properly before it, did not deprive the jury of the information necessary to a "discriminat[ing] appraisal" of the possible infirmities in Meredith's testimony. Accordingly, there was no constitutional error committed here. *See United States v. Tarantino*, 846 F.2d 1384, 1407 (D.C.Cir.) (where defense counsel was given opportunity to, and did, question witness about important aspects of plea bargain, restrictions on questioning as to that source of bias were permissible), *cert. denied*, 488 U.S. 840, 109 S.Ct. 108, 102

---

**3.** In fact, Meredith falsely claimed that James Lanham had not been arrested that day, a misstatement that Derr's attorney exploited during closing argument to show that Meredith was indeed trying to protect her kin.

**4.** Indeed, at oral argument, Derr's counsel alleged only that the excluded questioning would have "cemented" the evidence on this point already put before the jury. We agree that that is the most it could have done.

L.Ed.2d 83 (1988) (appellant Burns), *cert. denied,* 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988) (appellant Tarantino); *see also United States v. Foster,* 982 F.2d 551, 553 (D.C.Cir.1993) (where defense had effectively conveyed inconsistencies in witness' statements, preclusion of further questioning was not error).[5]

### B. *Suppression of Material, Exculpatory Evidence*

The April arrests of the Lanham brothers and Chay Rawls also provide the basis for Derr's second claim, that the government violated his due process rights by suppressing material, exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, Derr contends that the government violated *Brady* by failing to apprise him of (1) the physical evidence collected during the April search and (2) a post-arrest statement by Chay Rawls alleging that James and Michael Lanham and a third person identified only as "Nard"[6] ran a drug distribution operation from the Meredith apartment starting in January 1991—the time of Derr's arrest.

■ Derr's first *Brady* claim is meritless. As indicated by his aborted questioning of Meredith, Derr's counsel was aware of the April arrests at the time of Derr's trial. Yet, he sought neither information about the physical evidence obtained in connection with those arrests nor a continuance to allow effective use of information he had obtained. *Cf. United States v. Darwin,* 757 F.2d 1193, 1201 (11th Cir.1985) (when defendant receives information at trial, to prevail on *Brady* claim he must show prejudice from failure to disclose information earlier), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 896, 88 L.Ed.2d 930 (1986). Because *Brady* only requires disclosure of information unknown to the defendant, *see*

*United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976), and then generally only upon request, *see id.* at 107, 96 S.Ct. at 2399, Derr's knowledge at trial of the arrests combined with his failure to seek any information about the fruits of the accompanying search necessarily defeat this *Brady* claim. *Brady* provides no refuge to defendants who have knowledge of the government's possession of possibly exculpatory information, but sit on their hands until after a guilty verdict is returned.

■ Derr's *Brady* argument based on the Rawls statement—which Derr did not know about at trial—presents a closer question, but in the final analysis it also fails to persuade. To prevail under *Brady* and its progeny, a defendant must demonstrate that excluded evidence is "material"; that is, that there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (plurality opinion); *accord United States v. Caicedo–Llanos,* 960 F.2d 158, 161 (D.C.Cir.1992). Derr can make no such showing here. At first blush, Rawls' statement that the Lanham brothers and a third person sold drugs from the Meredith home starting in January 1991 might seem probative, principally because of its notable omission of any reference to Derr (about whom Rawls, however, was never questioned). But, in fact, its utility to Derr's defense would have been quite limited. As Derr's attorney acknowledged at oral argument, Rawls' statement is hearsay that would not be admissible within any recognized exception to the rule excluding such evidence. *See* Fed.R.Evid. 802–04; *see also United States v. Kennedy,* 890 F.2d 1056, 1059

---

**5.** The April arrests could have been relevant to a different theory of bias, *i.e.,* that Meredith would skew her testimony in the hope of obtaining leniency for her grandchildren on the charges stemming from the April arrests. *Cf. United States v. Anderson,* 881 F.2d 1128, 1137–39 (D.C.Cir.1989) (defendant entitled to cross-examine witness on question of bias stemming

from fact that a murder indictment against her had been dismissed without prejudice). But, at oral argument, Derr's counsel disavowed any intent to rely on this theory.

**6.** The prosecution does not argue that "Nard" was Tyrone Derr.

(9th Cir.1989) (to be "material" under *Brady*, undisclosed information or evidence acquired through that information must be admissible), *cert. denied*, 494 U.S. 1008, 110 S.Ct. 1308, 108 L.Ed.2d 484 (1990). Further, Derr's counsel also conceded that he could not have called Rawls to testify to the facts contained in the statement because Rawls' attorney would have relied on the Fifth Amendment to block any such effort. Stripped of the possibility of using it in either of those ways, the statement is reduced to essentially small potatoes for the defense. Derr's counsel identified it as only a "source" of further material to undermine Meredith's testimony, and he was vague as to its use in that regard. Presumably, Derr's attorney could have questioned Meredith about whether she knew of Rawls' statement inculpating his cousins because her knowledge of those accusations might intensify her alleged motive to lie to protect the Lanhams. Perhaps, as Derr's counsel hinted—albeit somewhat vaguely—the statement may have provided some additional "background" for other questioning regarding her knowledge of and possible benefit from her grandsons' illegal activities in January. But that kind of marginal help to Derr's basic strategy of exposing Meredith's bias is about all we can fathom as to the statement's value.

While evidence that promises dramatic impeachment is certainly a legitimate basis for a *Brady* argument, *see Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972), this evidence does not meet the "reasonable probability of acquittal" test. Even if the suppressed statement does constitute evidence capable of impeaching Meredith—to a greater degree than the evidence already offered—it obviously does nothing to impugn the significance of the physical evidence presented in the government's case-in-chief—the birth certificate, the keys found near the bed where Derr was sleeping, and Derr's aborted motion toward the keys as he was leaving the apartment—all potential indicators that Derr controlled the drugs and the gun. And whatever additional questioning of Meredith the statement might have led to, we are unable to conclude that it would have done anything substantial to change the jury's appraisal of her credibility. The jury had to be well aware of the perils of relying on the testimony of a witness whose statements, some totally unbelievable, *see supra* note 3, exonerated grandsons who were the obvious alternative suspects to the defendant as the owners of the closet drugs.

In sum, an incremental amount of impeachment evidence on an already compromised witness does not create a "reasonable probability" that the balance would have swung in favor of Derr. *Cf. Brewer v. Nix*, 963 F.2d 1111, 1113 (8th Cir.) (given vigorous cross-examination of witness' credibility, additional evidence on that point was not material), *cert. denied*, — U.S. —, 113 S.Ct. 273, 121 L.Ed.2d 201 (1992); *United States v. Rossy*, 953 F.2d 321, 324 (7th Cir.) (where witness' credibility had been challenged throughout trial and closing argument, it was highly unlikely that further cross-examination based on tardily discovered evidence would have changed jury's verdict), *cert. denied*, — U.S. —, 112 S.Ct. 1240, 117 L.Ed.2d 473 (1992); *United States v. Adams*, 914 F.2d 1404, 1406 (10th Cir.) (where there was significant direct evidence of guilt, additional impeachment evidence of witness whom the "jury undoubtedly recognized ... as a self-serving smooth-talking 'con' artist" was not material), *cert. denied*, 498 U.S. 1015, 111 S.Ct. 588, 112 L.Ed.2d 593 (1990). Derr's *Brady* claim will not stand.

## C. *Sufficiency of Evidence of "Use" of a Firearm*

 Derr contends finally that there was insufficient evidence adduced at trial to support the jury's verdict that he violated 18 U.S.C. § 924(c)(1) [7] by "using" a firearm

---

**7.** That provision states in relevant part:

Whoever, during and in relation to any ... drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such ... drug trafficking crime, be sentenced to imprisonment for five years,....

The government does not contend that Derr "carrie[d]" the .357 Magnum, so our analysis turns on whether Derr "use[d]" that firearm.

"during and in relation to" a drug trafficking crime, in this case the possession of the cocaine found in the closet. The responsibility for drawing inferences from facts rests primarily with the jury; we tread gingerly in overturning its verdict for evidentiary insufficiency. If, viewing the evidence in the light most favorable to the government, *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original), we affirm. However, in the rare case—and this is one—where we conclude that the evidence adduced at trial does not meet even that lenient standard, we are obliged, as a matter of due process, to reverse the jury's determination. *See In Re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970); *see also United States v. Long,* 905 F.2d 1572, 1576 (D.C.Cir.) ("We must ensure that the evidence adduced at trial is sufficient to support a verdict as a matter of law. A jury is entitled to draw a vast range of reasonable inferences from evidence, but may not base a verdict on mere speculation."), *cert. denied,* 498 U.S. 948, 111 S.Ct. 365, 112 L.Ed.2d 328 (1990).

■■■ To establish that a defendant "used" a firearm during and in relation to a drug crime, the government must show beyond a reasonable doubt that (1) there was a nexus between the weapon in question and the defendant (usually this means demonstrating constructive or actual possession of the firearm by the accused), and (2) the gun was "used" to facilitate the predicate offense in some way. *See United States v. Jefferson,* 974 F.2d 201, 205 (D.C.Cir.1992); *see also United States v. Morris,* 977 F.2d 617, 621 (D.C.Cir.1992). In this case, the government has little difficulty satisfying the first prong of this test. There was ample evidence from which a reasonable juror could infer that Derr had dominion and control, *i.e.,* constructive possession, over the .357 Magnum. The location of the closet keys next to the bed

where Derr slept, his furtive movement toward them as he was leaving the apartment, and the presence of his birth certificate in the closet next to the gun are more than enough to allow a reasonable juror to conclude that Derr possessed the firearm. *See United States v. Gibbs,* 904 F.2d 52, 57 (D.C.Cir.1990) (possession of key to trunk of car enough to show constructive possession of firearm found in trunk); *see also United States v. Hernandez,* 780 F.2d 113, 117 (D.C.Cir.1986) (proximity coupled with "gesture toward the contraband, suggesting an ability to control the item" allows reasonable inference of constructive possession); *see generally United States v. Pardo,* 636 F.2d 535, 549 (D.C.Cir.1980) (to establish constructive possession, there must be "some action, some word, or some conduct that links the individual to the [contraband] and indicates that he had some stake in [it], some power over [it]").[8]

■■■ The government runs into much rockier terrain, however, in trying to establish that the gun was used to facilitate Derr's possession of the drugs, the second prong of the test. Although an individual may "use" a gun without ever firing or brandishing it, *see Morris,* 977 F.2d at 621, there must be evidence showing that the firearm actually facilitated the *possession* of the drugs. Usually this is done by showing that the gun was employed to guard the stash. It is not, however, enough that the gun was intended to be used to protect the possession at some later time; it must be performing that function *"during"* the time of the possession which is the basis of the charge. *See United States v. Bruce,* 939 F.2d 1053, 1055 (D.C.Cir.1991) ("It is important to note ... that Congress did not make it a crime to possess a gun with the *intent* to use it in relation to a drug trafficking crime.") (emphasis in original). When the predicate offense is possession, it is also insufficient for the evidence to indicate that the gun would be used at a later time in distributing the drugs. *See id.* at 1056.

---

**8.** This evidence also undermines Derr's claim that there was insufficient proof that he pos-

sessed the cocaine found in the closet.

■ While we have no sure-fire test for deciding whether a gun is (or has been) actually used to protect possession, we have enumerated a nonexclusive set of factors to weigh in making that judgment. Among other things, we look to whether a gun is accessible to the defendant, whether it is located in proximity to the drugs (which may cut either way depending on the facts of a particular case), whether it is loaded, what type of weapon it is, and, finally, whether there is expert testimony to bolster the government's particular theory of "use." *See Morris*, 977 F.2d at 621–22.

Here, the first factor, the accessibility of the weapon, is the most significant. It is hard to figure out how a reasonable juror could infer from the evidence that Derr's weapon would be available to him should he need it to protect his stash. The police officers found the .357 Magnum unloaded—a fact by itself in some tension with actual use—behind lock and key in a closet. Before the weapon could have been of any use, Derr would have had to run to the closet, open the padlock with his keys, grab the weapon, and load it. In the case of a revolver such as was found here, loading the gun would require Derr to place a bullet in each chamber of the cylinder. That scenario—and no evidence was elicited to bolster any theory that the gun was ever positioned in a more available location in the apartment—does not spell accessibility to us, nor do we think it would to a reasonable juror.

The government counters, however, that there was evidence showing that this was a "crack house," *i.e.*, that it was home to an "ongoing drug distribution operation," and that we are much more willing to infer that a weapon has been "used" when it is found in such a location. *See, e.g., United States v. Anderson*, 881 F.2d 1128 (D.C.Cir.1989); *see also Bruce*, 939 F.2d at 1055 (since distribution and possession are intertwined in crack houses, it is reasonable to treat "evidence of use of guns in such a house for protection of the distribution function as equivalent to protection of possession"). But, even if the evidence here established that the apartment was a crack house akin

to that in *Anderson*, Derr's weapon still must be readily available in order to protect his possession or distribution of drugs. *See id.* at 1056 (in *Anderson*, weapons were "within easy reach or in plain sight, ... permitting the inference that they were being used to protect the possession and distribution from that location"). Wherever the weapon is possessed, there must be evidence establishing its accessibility to support a finding of use. *See Morris*, 977 F.2d at 621 (emphasizing the importance of accessibility to upholding a § 924(c) conviction because "[a] gun kept close at hand is more likely being used for protection than a gun packed away in a hard-to-reach spot"); *Jefferson*, 974 F.2d at 207 (upholding conviction in large part because of evidence showing that the firearm was "sufficiently accessible" to defendant); *United States v. Lyman*, 892 F.2d 751, 754 n. 4 (8th Cir.1989) ("The key is always whether the placement of the gun or guns suggests they would be quickly available for use in an emergency."), *cert. denied*, 498 U.S. 810, 111 S.Ct. 45, 112 L.Ed.2d 21 (1990). That evidence is missing here.

In this case, the second factor, the proximity of the gun to the drugs, also cuts against, rather than in favor of, a conclusion that the gun was used to protect the stash. It is true that guns strategically placed near the drugs, *Morris*, 977 F.2d at 623, or strewn around the same room as the narcotics, *Anderson*, 881 F.2d at 1131; *see also Bruce*, 939 F.2d at 1055, have supported inferences that the weapons are in use to guard the narcotics. In those instances, the inferences were warranted because the guns were not only accessible, but suitably positioned for activation if someone tried to steal the narcotics. *Cf. Jefferson*, 974 F.2d at 203, 206 (sufficient evidence to support use where weapon was stored with some of the drugs but across the backyard from the rest). The mere proximity of guns to drugs does not, however, inevitably lead to the conclusion that the guns are being or have been "used" to protect the drugs, *see Morris*, 977 F.2d at 622, and here their proximity to one another in the locked closet suggests that the

usual scenario is quite implausible. Should an intruder barge in to steal his drugs, Derr would not only have to access the gun quickly—which would be no mean feat—he would also have to open up the very closet where the drugs were stored. That act could expose the drugs to capture as well as risk the intruder getting to the weapon first and possibly using it against him. Thus, unlike the strategic placement of weapons in *Morris* and *Anderson*, here the gun seems to have been put where it was least likely to protect possession of the drugs.[9]

Rather than falling within the rule of those cases, we think the facts here are more akin to those in *Bruce*. There, a *loaded* gun—a small caliber pistol—was stowed together with the drugs, about $850 in cash, and ziplock bags in the pockets of the defendant's raincoat hanging in a closet. The court found that the firearm's location suggested that it was far more likely that the gun would be used to protect the distribution, rather than the possession, of the drugs. *See* 939 F.2d at 1056; *see also Morris*, 977 F.2d at 622. A similar inference is warranted here. Derr's .357 Magnum was found holstered—suggesting that it was meant for use on the go—in a closet next to cocaine and similar drug paraphernalia, including bags for packaging the cocaine. In fact, Derr's weapon was more inaccessible than the one found in *Bruce*, and, unlike the firearm at issue there, it was unloaded. Admittedly, the facts here are not identical to *Bruce* (a cutting board and scale were also found in Derr's wooden box along with the cocaine); nevertheless, we conclude that, as in *Bruce*, the location of the gun—unloaded and inaccessible for current use—immediately next to the drugs must create at least a reasonable doubt in a reasonable juror's mind that Derr intended to use the gun to protect his current possession rather than for the later distribution of the drugs.

The government's contrary evidence proves ultimately insufficient to overcome these logical obstacles and allow a rational juror to infer use beyond a reasonable doubt. The government points out that the .357 Magnum used in this case, unlike the weapon in *Bruce*, is compatible with the type of weapon used to protect ongoing drug operations. On the other hand, as the government acknowledged at oral argument, that same weapon is also frequently employed to protect street-level distributors. Thus, the nature of the weapon is basically a wash in the calculus of this case. The government also points to the expert testimony of Officer Stroud detailing the possible uses of a .357 Magnum to protect the possession of the drugs. While marginally helpful to the prosecution, this background information about the *modus operandi* in the drug trade cannot compensate for the lack of actual factual evidence from which a reasonable juror could infer that the gun *in this case* was used to protect the possession of these drugs. As we have discussed, all the real evidence—the behind-padlocked-door inaccessibility of the weapon, the unsuitability of the weapon for quick use (it was unloaded), the fact that it was holstered and in proximity to drugs and paraphernalia likely destined for distribution elsewhere—suggests that the gun was being used not in protecting the drugs in the closet but, rather, as a means to protect their later distribution. The district court's judgment on the firearms charge is therefore reversed.

## Conclusion

We reject Derr's arguments that his rights under *Brady v. Maryland* and the Confrontation Clause have been violated,[10]

---

**9.** Conceivably, Derr could have taken both the drugs and the guns out of the closet and used the gun to protect the narcotics while he was preparing them for sale. But there was no evidence whatsoever at trial suggesting that such a scenario ever occurred, and the fact that the gun was found unloaded makes it even less plausible. *Cf. Jefferson*, 974 F.2d at 207 (relying on evidence of past use to uphold § 924(c) conviction).

**10.** We also reject Derr's claim that the district court should have required the government to divulge the identity of the secret informant whose tip provided the basis for the January 1991 search warrant. Derr's arguments for why the informant's testimony would have been

but we agree that no reasonable juror could have concluded beyond a reasonable doubt that he used the firearm found in the closet to protect his possession of the near-by drugs. Accordingly, we reverse his firearms conviction, but affirm his drug possession conviction.

*So ordered.*

valuable to his case, *e.g.,* that the informant may have seen James Lanham enter the hall closet, are entirely speculative. As we have said, "speculation … is not sufficient to meet the heavy burden which rests on an accused to establish that the identity of an informant is necessary to his defense." *United States v. Skeens,* 449 F.2d 1066, 1070 (D.C.Cir.1971).