# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued April 13, 2010         Decided July 16, 2010

No. 07-3036

UNITED STATES OF AMERICA,
APPELLEE

v.

CHARLES E. HALL,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 04cr00543-01)

*Charles B. Wayne*, appointed by the court, argued the cause and filed the briefs for appellant.

*Katherine M. Kelly*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Roy W. McLeese III*, *Chrisellen R. Kolb*, and *Virginia Cheatham*, Assistant U.S. Attorneys.

Before: SENTELLE, *Chief Judge*, GINSBURG and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*: Charles Hall appeals from a judgment of conviction imposed against him for one count of conspiracy to commit crimes against the United States, two counts of bank fraud, four counts of wire fraud, and one count of money laundering conspiracy. He assigns error relating to both the admission and the sufficiency of evidence. We affirm all convictions save the one count of money laundering conspiracy, which we reverse. As the sentences on all counts were concurrent, there is no need for a remand for resentencing.

# I

From April 2002 until May 2003 appellant Charles Hall worked as a loan officer at mortgage company Guaranty Residential Lending ("GRL"). While in this position, Hall became involved in a scheme with six others to "flip" numerous residential properties in Washington, D.C. In perpetrating the scheme, co-conspirator Alan Davis would buy homes in disrepair. Hall would then find straw buyers to purchase the homes from Davis. Before the homes were resold to the straw buyers, however, co-conspirator Robbie Colwell, a sham appraiser, would appraise the homes in disrepair as if they had been renovated. These higher (false) appraisals were then sent to GRL and another mortgage company, National City Mortgage Company ("NCM"). These lending institutions would then provide mortgage funding, facilitated by co-conspirators Susan Shelton and Marcus Wiseman, underwriters at GRL and later NCM. The funds were sent to co-conspirator Vicki Robinson, the settlement agent for the property sales. Robinson worked for Vanguard Title, a settlement company owned by attorney Marc Sliffman. Robinson would give a portion of the funds to Hall, who would then convert a portion of those funds into cashier's checks in the amount that the straw buyer was supposed to bring to settlement as a downpayment. At settlement Hall would receive the loan proceeds, identified on the property settlement

documents as reimbursement for "rehab construction," most of which was never done. Instead, Hall took the money as income for himself. Most of the properties involved later went into foreclosure, with a resulting loss to GRL and NCM of over $5 million.

Hall was indicted on charges of conspiracy, bank fraud, wire fraud, and money laundering. At trial Hall's co-conspirators, who had pled guilty to charges against them, testified against Hall. Hall testified in his own defense, claiming that Robinson and Sliffman had told him that what he was doing was legal. He was found guilty as charged by the jury, and sentenced to 293 months on each of the bank fraud and money laundering charges, and 60 months on each of the remaining charges. All sentences were imposed to run concurrently.

On appeal Hall raises six issues. First, he argues that the government failed to prove the elements of bank fraud. Next, he claims that the government failed to prove the elements of conspiracy to commit money laundering. Third, he claims that his Sixth Amendment rights were violated when he was precluded from cross-examining the government's witnesses on the details of their plea agreements. Fourth, he asserts that the district court erred in refusing to allow evidence in support of his defense that he lacked the specific intent necessary to commit the charged offenses. Fifth, he claims that the district court erred in treating the sentencing guidelines as presumptively applicable. Finally, he contends that a hearing should be ordered on his ineffective assistance of counsel claim. Because we see no merit in Hall's claims that the district court erred in treating the guidelines as presumptively reasonable or that a hearing should be ordered on his ineffective assistance of counsel claim, our discussion is limited to his arguments concerning the sufficiency-of-the-evidence and his evidentiary objections.

4

## II

We turn first to Hall's challenge to the sufficiency of the evidence against him on the bank fraud counts. Hall was charged with, and found guilty of, two counts of bank fraud in violation of 18 U.S.C. §§ 1344 & 2; one count alleged the defrauding of GRL and the other the defrauding of NCM. To prove bank fraud under § 1344 the government must show that the defendant knowingly defrauded a federally insured financial institution. *See, e.g.*, *United States v. Brandon*, 17 F.3d 409, 424 (1st Cir. 1994). At trial, the government put forth evidence showing that GRL was a wholly-owned subsidiary of federally insured Guaranty Bank, and that NCM was an operating subsidiary of federally insured National City Bank of Indiana. Hall does not dispute the accuracy of this evidence, but he argues that without more the evidence was insufficient to prove that the parent banks were victims of the fraud. He also argues that the evidence failed to prove that Guaranty Bank was federally insured from April 2002 to May 2003, the time of the alleged fraud, because the only evidence put forth by the government showed that Guaranty Bank was insured on February 14, 2005, but no earlier. The government disagrees, arguing that the evidence was sufficient to support Hall's conviction of defrauding federally insured financial institutions.

We review sufficiency-of-the-evidence challenges in the light most favorable to the government, "giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Carson*, 455 F.3d 336, 368–69 (D.C. Cir. 2006). There is little precedent on the sufficiency of evidence governing this issue. As the First Circuit has observed, "[n]either the statute nor the case law fully instructs just how tight a factual nexus is required to allow a jury to decide that a scheme, formally aimed at one (uninsured) company, operates in substance to defraud another (insured)

entity with whom the defendant has not dealt directly." *United States v. Edelkind*, 467 F.3d 791, 797 (1st Cir. 2006). The easier case for us is that of GRL: being wholly owned by federally insured Guaranty Bank, a loss to GRL would constitute a loss to Guaranty Bank. *See United States v. White*, 882 F.2d 250, 253 (7th Cir. 1989) ("A wholly owned subsidiary is, by definition, wholly owned by its parent, so it is natural to attribute its assets to the parent."). A somewhat more difficult situation arises with respect to NCM, described at trial only as an operating subsidiary of federally insured National City Bank of Indiana. However, even though NCM was not, like GRL, described as a wholly owned subsidiary, its status as an operating subsidiary implies at least a majority or controlling interest held by National City Bank of Indiana, and consequently a loss to NCM would constitute a loss to federally insured National City Bank of Indiana.

We are not quite finished with our insurance discussion, however, as Hall contends that in any event Guaranty Bank was not shown to be federally insured from April 2002 to May 2003, the time of the alleged fraud. He notes that the government put forth evidence showing only that Guaranty Bank was federally insured as of February 14, 2005. We confronted a similar situation in *United States v. Nnanyererugo*, 39 F.3d 1205 (D.C. Cir. 1994). In that case the defendant, like Hall, was charged with, and convicted of, bank fraud under 18 U.S.C. § 1344. He too claimed that the government did not prove that the defrauded bank was federally insured at the time of the offense. The only evidence of such insurance came from the trial testimony of an official of the defrauded bank, given two years after the crime took place. That official stated at trial that the bank "is" federally insured. We nevertheless ruled "that the government may rely on testimony of present insured status as evidence of its prior existence, 'at least where the time span is not too great and there is no suggestion of an intervening circumstance that

might call its previous existence into question.'" *Nnanyererugo*, 39 F.3d at 1208 (quoting *United States v. Sliker*, 751 F.2d 477, 484 (2d Cir. 1984)). We concluded that the bank official's "testimony was sufficiently close in time (two years) to the date the crime took place to justify a jury inference that the bank was previously insured." *Id.* at 1209 (citing *Sliker*, 751 F.2d at 484, which held that an unspecified length of time (at most 3 years) was "not too great"). Reasoning consistently with *Nnanyererugo* and *Sliker*, we hold that a trier of fact could reasonably infer from the trial evidence that during the time period of Hall's bank fraud, which was two to three years before the evidence showed federally insured status, Guaranty Bank was in fact federally insured. Therefore, we conclude that the evidence was sufficient to support Hall's conviction for defrauding federally insured financial institutions.

Before ending our insurance discussion, however, we must, as we did in *Nnanyererugo* in 1994, castigate the government for not taking the simple steps necessary to prevent this insurance-status problem. As we stated those many years ago, quoting *Sliker*, 751 F.2d at 484, "we are bemused to discover that the Justice Department 'still has not effectively instructed prosecutors to ask the simple question that would avoid the need for judicial consideration of what should be a non-problem.'" *Nnanyererugo*, 39 F.3d 1208. The government should not continue to test its luck and our patience. We perceive no explanation, nor has the government offered one, as to why the government should not be introducing certificates reflecting the dates in the indictment rather than the one reflecting the institutions' insured status at some later date. The sufficiency of evidence is always situational. The government should not find out the hard way what change in circumstances would be sufficient to render its inadequate performance on this issue fatal to a conviction.

## III

We turn next to Hall's claim that the government failed to prove the elements of conspiracy to commit money laundering. Hall was charged in the indictment with, and found guilty by the jury of, conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(h). During Hall's trial, Robinson, the settlement agent from Vanguard Title, testified that at settlements for three of the properties with which Hall was involved, she received the loan money from the lender and gave Hall a check for the rehab construction alleged to have been done. Robinson further testified that after receiving his check Hall would then go to a bank where he would get Robinson a cashier's check for the amount of the funds the buyer was to bring to the closing. According to the government, Robinson's testimony showed that Hall's bank fraud offense was complete when Robinson received the loan money from the lender, and that Hall's money laundering offense occurred when he took his check from Robinson and used part of it for down-payment cashier's checks. Hall argues that the evidence was insufficient to support his money laundering conviction because the alleged money laundering activity was part and parcel of the underlying bank fraud. We agree with Hall.

Section 1956(a)(1)(A)(i) of 18 U.S.C. prohibits money laundering, while § 1956(h) penalizes conspiracy to commit money laundering. Section 1956(a)(1) states, "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—(A)(i) with the intent to promote the carrying on of specified unlawful activity . . . shall be sentenced to a fine . . . or imprisonment . . . ." The offense of money laundering must be separate and distinct from the underlying offense that generated

the money to be laundered. *See United States v. Castellini*, 392 F.3d 35, 47 (1st Cir. 2004) (money laundering "cannot be the same as the illegal activity which produces the proceeds"); *United States v. Butler*, 211 F.3d 826, 830 (4th Cir. 2000) ("the laundering of funds cannot occur in the same transaction through which those funds first became tainted by crime"); *United States v. Mankarious*, 151 F.3d 694, 706 (7th Cir. 1998) ("a money laundering transaction . . . must be separate from any transaction necessary for the predicate offense to generate proceeds"); *United States v. Edgmon*, 952 F.2d 1206, 1213 (10th Cir. 1991) ("Congress appears to have intended the money laundering statute to be a separate crime distinct from the underlying offense that generated the money to be laundered.").

Hall's scheme involved fraudulently obtaining bank loans for the sale and purchase of properties. To sell and purchase the properties, Hall went through the settlement process which involved the presentation by the buyers of downpayments by cashier's check. In other words, completion of the settlement process made the bank fraud successful. If the bank fraud offense was complete when Robinson received the loan money from the lender, as the government argues, and the defendants at that point had just stopped the settlement process and run off with the money, the bank fraud would not have been very successful, to say the least.

Moreover, Hall was charged in the indictment with two counts of devising a scheme to defraud banks GRL and NCM. The two counts reference specific preceding paragraphs of the indictment for a description of the bank fraud scheme. These descriptive paragraphs state that the banks required cash from the borrower to purchase property, and that Hall "used a portion of the loan money to fund the 'cash from borrower' by purchasing cashier's checks so that it would appear as though the buyers had paid their own money as part of the purchase

price." Additionally, the indictment alleged that the goal of the conspiracy was, in pertinent part, to "obtain in excess of 5.3 million [dollars] by . . . after the settlement process, using the loan money to purchase cashier's checks so that the borrowers' cash appeared to have come from the buyers . . . ." Consequently, based on the scheme alleged in the indictment, this purchasing of cashier's checks to be used as cash from the borrowers at settlement was a necessary element to complete the bank fraud. This same transaction, however, was alleged in the indictment as the overt act for money laundering. Viewing the evidence in the light most favorable to the government, we conclude that this same transaction cannot be money laundering. As we have already noted, the offense of money laundering must be separate and distinct from the underlying offense that generated the money to be laundered. We further note that the alleged money laundering transaction at issue is, in this instance, an expense of the bank fraud, and an expense of an underlying fraud cannot be money laundering. *United States v. Santos*, 128 S.Ct. 2020, 2027 (2008) ("a criminal who enters into a transaction paying the expenses of his illegal activity cannot possibly violate the money-laundering statute").

**IV**

Hall contends next that his Sixth Amendment rights were violated when he was precluded from cross-examining the government's witnesses on the details of their plea agreements. During trial Hall's attorney attempted to cross-examine two of Hall's co-conspirators, who were testifying against him for the government, on the effect their plea agreements would have on their potential prison sentences. In particular, Hall's attorney asked Alan Davis, who had been charged with bank fraud, whether he ever learned what the prison sentence was for that crime, and questioned Susan Conner on whether she understood that the charges against her could result in 30 years of prison

time. The government objected to each of these questions, and the district court sustained the objections. Hall argues on appeal that in sustaining the government's objections, the district court prohibited him from cross-examining the co-conspirators on the details of their plea agreements and thus deprived him of an important means of exposing any bias, violating his Sixth Amendment right to confront the witnesses against him. The government argues that additional cross-examination of the co-conspirators on the terms of their plea agreements was sufficient to satisfy Hall's Sixth Amendment rights.

Cross examination of the prosecution's witnesses is a right fundamentally guaranteed by the Confrontation Clause of the Sixth Amendment. *United States v. George*, 532 F.3d 933, 934 (D.C. Cir. 2008). This Sixth Amendment right, however, "does not require a trial court to permit unlimited cross-examination by defense counsel," but rather requires "the court to give a defendant a 'realistic opportunity to ferret out a potential source of bias.'" *United States v. Davis*, 127 F.3d 68, 70 (D.C. Cir. 1997) (quoting *United States v. Derr*, 990 F.2d 1330, 1334 (D.C. Cir. 1993)); *see also United States v. Anderson*, 881 F.2d 1128, 1139 (D.C. Cir. 1989) (A trial court "may limit cross-examination only after there has been permitted, *as a matter of right*, a certain threshold level of cross-examination which satisfies the constitutional requirement."). A violation of the right has occurred if "'[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination.'" *Davis*, 127 F.3d at 70-71 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)). A violation has not occurred "so long as defense counsel is able to elicit enough information to allow a discriminating appraisal of the witness's motives and bias." *United States v. Graham*, 83 F.3d 1466, 1474 (D.C. Cir. 1996) (internal quotations and citation omitted). In the present case, the district court allowed

Davis to testify on cross-examination that he had made a deal with the government, that pursuant to the deal he was going to be treated favorably in exchange for his testimony, that the government was allowing him to plead guilty to only one offense, and that without the plea agreement he was facing substantially more charges. The court also allowed Conner to testify on cross-examination that she had made a deal with the government and that she had been allowed to plead guilty to only one count of bank bribery. Taking this evidence allowed by the district court into consideration, the evidence disallowed regarding the potential sentences faced, or avoided, by Davis and Conner by pleading guilty would not have given the jury "a significantly different impression" of any bias. We conclude that the district court allowed sufficient cross-examination of Davis and Conner on their plea bargains to satisfy Hall's Sixth Amendment rights.

**V**

Finally, Hall argues that the district court erred in refusing to allow evidence in support of his defense that he lacked the specific intent necessary to commit the charged offenses. During trial Hall's attorney attempted to cross-examine the co-conspirators testifying for the government about what attorney Marc Sliffman, the owner of Vanguard Title, had told them about the legality of the mortgage scheme. The district court disallowed this line of cross-examination following an objection by the government. Hall argues on appeal that the district court erred in sustaining the government's objection in that the ruling denied him the opportunity to present evidence supporting his defense that he lacked the specific intent required for each of the charged offenses. He contends that at the time of the attempted cross-examination he had planned to argue, as his primary defense, that he believed that all of his conduct was legal because of statements made to him and his co-conspirators by

attorney Sliffman. If such cross-examination had been permitted, Hall claims, his co-conspirators would have corroborated his own direct testimony, given later, that attorney Sliffman had stated that the transactions were legal. In its brief, the government's main response to Hall's argument is that the district court did not err in its evidentiary ruling because the testimony Hall sought to elicit constituted impermissible hearsay.

We review a district court's decision to exclude evidence for abuse of discretion. *United States v. Lipscomb*, 702 F.2d 1049, 1068 (D.C. Cir. 1983). We begin by noting that although the district court sustained the government's objection, the court gave no express reason for its decision, and our analysis is consequently somewhat more difficult. The government's argument at the time of its objection was that the questioning was not allowable because the testimony elicited would have been hearsay. Hearsay is a statement made out of court that is "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). But the statement here was not offered for its truth, *i.e.*, that the mortgage scheme was legal; rather, it was offered to show that Hall believed that the scheme was legal. The elicited testimony was therefore not hearsay and the government's counsel admitted as much at oral argument. Consequently the testimony was not excludable on that basis.

Nevertheless, the district court did not err in excluding the testimony. In *United States v. Hemphill*, 514 F.3d 1350, 1360 (D.C. Cir. 2008), we noted that although the right to cross-examination was "an important component of the right of confrontation," the trial court nevertheless "retains broad discretion to control cross-examination." We noted in particular that the trial court "may prevent questioning that does not meet the basic requirement of relevancy, as well as other factors affecting admissibility." *Id.* (internal quotations and citation

omitted). In this case, the testimony called for by the examiner's question did not meet the minimal standard of relevance. The Federal Rules of Evidence provide an explicit definition of "relevant evidence":

> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Fed. R. Evid. 401.

Testimony as to whether attorney Sliffman had told Hall that the transactions were legal did not make any fact then within the consideration of the court or jury either more or less probable than it would have been without the testimony. When questioned on this subject at oral argument, defense counsel stated, consistent with the trial record, that the evidence was offered to corroborate testimony that the defense expected to offer during its case in chief. As it developed, perhaps the disputed testimony may have been relevant after the defense made such an introduction in its case in chief. However, at the time the district court made its ruling, no such testimony was before it. While it is true, as appellant argues on appeal, that trial courts from time to time may admit evidence that is not yet relevant subject to its being stricken should its relevance not be shown later, we can hardly say that the district court abused its discretion by refusing to admit evidence that was not then relevant. This is especially true in the case at bar. The defense proffer is based on the theory that the evidence would corroborate testimony to be given later by the defendant. The choice of whether to testify is a personal right of the defendant. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). If the evidence were admitted subject to being stricken, and the defendant did not testify or testified inconsistently with the disputed testimony,

then the judge's act in ordering it stricken might well call to the jury's attention in an arguably impermissible manner the fact that the defendant had exercised his rights against self incrimination. *See generally Griffin v. California*, 380 U.S. 609 (1965) (explaining that commenting on a defendant's failure to testify violates the Fifth Amendment).  We are not deciding that it would have been error for the judge to run that risk, but it certainly was not error for him to refuse to do so.  In short, we conclude that the district court's sustaining of the government's objection was not an abuse of discretion.

## VI

In summary, we affirm Hall's convictions on bank fraud, reject his evidentiary objections, and reject also his sentencing guidelines and inadequacy of counsel claims.  We reverse his money laundering conviction, representing the charges under 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(h).   Since concurrent sentences of 293 months were imposed on each of the bank fraud charges as well as on the money laundering charge, no remand for resentencing is necessary. *See, e.g.*, *United States v. Kearney*, 498 F.2d 61, 63 n.2 (D.C. Cir. 1974) (remand for resentencing unnecessary where concurrent sentences imposed for both vacated convictions and affirmed convictions).

*So ordered.*